Case number 15-3386 and 3387 Muhammad S. Galea and Anthony Hancox vs. Nationwide Mutual Insurance Company. Argument not to exceed 15 minutes per side. Mr. Shorke, you may proceed for the appellant. Good morning. May it please the court. My name is Eric Shorke and I represent the plaintiffs Muhammad Galea and Anthony Hancox. Can you either keep your voice up or get the mic closer to you? Yeah, I was going to say that. At this time, I'd like to reserve three minutes for rebuttal. In this case, the district court dared to find this plaintiff's lack of standing to assert their claims relating to the significantly increased risk of identity theft that they face as a result of a theft of data from Nationwide's computer systems through which they have their social security numbers, their dates of birth, their employment histories, as well as their names, which were stolen by criminals in a sophisticated hack. The district court, in dismissing this case on Article III standing grounds, really committed two errors. The first error relates to a misstatement or wrongfully analogizing this case with the facts of Clapper v. Amnesty International, which was a standing case but decided by the Supreme Court. In that case, the Supreme Court applied an especially rigorous standing analysis on account of the fact that there was a law being challenged. And because the doctrine of standing is premised on separation of powers and there was a legislative enactment being passed, as the Supreme Court recognized, the standing analysis was especially rigorous. The facts of Clapper really couldn't be much different than those at issue here. There, a group of human rights organizations filed a case at issue the day that an amendment to the Foreign Intelligence Surveillance Act was passed, seeking a declaration that the amendment was unconstitutional and an injunction from the government using the section at issue to surveil communications. The Supreme Court basically found that the respondents at that issue, the human rights organizations, had shown no evidence that their communications with foreign contacts would ever be monitored under the surveillance program at issue. And really, it went through five steps, basically, that would have to happen for the communications at issue to be monitored. And basically, it was founded upon guesswork, upon guesswork, upon guesswork. In Clapper, I understand your point that the facts are different, that the court uses the certainly impending language to describe what would be the first standing. How do you overcome that certainly impending language to establish that increased risk of harm? Well, I think the answer to that is that Clapper didn't change the law regarding harm with three standings. The language that courts used for decades now, and there's been some variations, but it's been certainly impending harm with a substantial risk. Clapper expressly recognized that future injury can constitute standing. Then, subsequent to Clapper, in the Susan B. Anthony List case, the court reiterated the certainly impending substantial risk of harm standard, but also cited with authority cases where the Supreme Court has used terminology such as credible, credible threat of harm, well-founded threat of harm, not chimerical, not imaginary, not wholly speculative. So, while the language is the same, in applying the doctrine of standing, the Supreme Court is, it really, it's a matter of degree as to what constitutes a substantial risk of harm. In applying the analysis, I think that the Supreme Court has been consistent in that the doctrine is built upon the separation of powers, and so because of that, the purpose of the doctrine is really to keep people from using the courts to legislate, to strike down legislative enactments or executive declarations. In the Clapper case, for instance, which I think is really why it is instructive, arguably you could say that the human rights organization was seeking to, quote-unquote, legislate through the courts. They were seeking to strike down a law that was passed, or they argued that, you know, potentially they could be subject to that law, but really there would be reasonable grounds to say that, hey, they are looking to legislate through the courts. Here, that's not an issue. I don't think anyone could reasonably say that plaintiffs are seeking to legislate. Their information was stolen, a sophisticated hack, by criminals who risked prosecution in doing so. It's reasonable to believe, as the Seventh Circuit recognized in the New Market Decision, that the reason the criminals stole the information was to use it for improper purposes, likely. There's a real risk of identity theft that they face. I know in the complaint we cited to the fact that certain studies support that if you receive a data breach notification letter, you're 9.5 times more likely to suffer identity theft. We also cited to another study that cited reports that individuals who received a notification letter were at 19 percent risk of suffering identity theft in the near future thereafter. In this case, although it relates to the amended complaint, one of the individuals, one of the plaintiffs, Mr. Galleria, did actually suffer identity theft. The same information was used, actually, that was stolen through the nationwide data breach in an attempt to open credit cards in his name, using a Social Security number, his name, address, and similar information. And I think the court's analysis really erred in, first, facts of clapper were erred in. Second, the court grossly overstated how stringent the standard requirement is based upon, admittedly, the strong language that was used in clapper. And I think courts have struggled with how stringent that language was, at least until the Anthony decision came out, with the Stratton's decision, where the court seems to have rolled back, or at least tempered, the language that was used in clapper and basically conveyed that the standard requirement is the same as it's always been. Is this case different from the Thurston case, or is that case just long ago? Well, I do think that this case is different from the Riley case because, well, I think the main reason is the conclusions that the Third Circuit came to. There was essentially no evidence that the hacker read, copied, and understood the personal information that was stolen, that the hacker intends to commit future criminal acts by misusing the information, or that the hacker would be able to use such information to the detriment of the appellant. Here, I mean, this was a sophisticated hack on one of the largest insurance companies in the country, if not the world. Again, the reasonable inference is that the information was stolen for improper means. It's the worst type of information that can be stolen because it includes social security numbers. And in Plaintiff's complaint, we cite several instances where supporting that when information is stolen, especially in a sophisticated hack like this, there is a real significant risk of identity theft. So I think that, at the very least, in strewing facts in Plaintiff's favor, which is required at this stage of the case, there is a difference in the posture of the cases. But it would also be our position that Riley did apply an overly stringent standing analysis. And are mitigation costs important to this analysis, or not? Mitigation costs are important to the analysis. They are. Because Plaintiff's did not specifically allege that, that's not an issue that we appealed. I'm not completely – what did you say? We did not – in the lower court, we allege that mitigation costs were part of the standing analysis. But because the Plaintiff's do not specifically allege mitigation costs, that's not an issue that we appealed. So no, it wouldn't be part of the current analysis. Do you say you don't – I didn't understand that. So you're not saying that you're – that you will or haven't heard mitigation costs? We haven't. To better your credit? No, we have not alleged that. We've alleged that the Plaintiff's are at significantly increased risk and suffer real, credible threat of identity theft. And again, in the amended complaint, the proposed amended complaint, which the court denied as the domain, we noted that one of the Plaintiff's had suffered identity theft. So how does that get compensated? I'm sorry? How would you compensate for that? For the risk of harm? Yes. Well, I think that the court would have a variety of means to do so through equity, largely. They could use – the easiest way would probably be monetary payment for financial loss suffered as a result of the debt breach, if any, to compensate the individuals for the time they had to spend remedying the effects of identity theft occurred as a result of the breach. And the third would be – Isn't that – I'm getting confused. Isn't that mitigation? Are you talking about the time they spent? Well, are we talking about the remedy? Yes. The remedy would be compensation for any financial losses, compensation for time spent, and also compensation likely for – to protect themselves against future loss. And that would be your credit monitoring programs and whatnot. But I thought you just said you weren't claiming those things. Am I misunderstanding you? We're not claiming that as a basis for Article III standing. You know, the Article III standing, that's – those would be the remedy that we'd be seeking. The Article III standing analysis and the argument that we're making is that the increased risk of identity theft alone, with respect to all claims except for the willful violation of their claim, is sufficient to satisfy standing requirements. One element of standing is redressability. How does this court address the injury that could be defined as a corrective injury? Well, from a redressability standpoint, that would be – we'd be looking for – So you are looking at that as part of some of the – Yes. I guess if we look at it that way, yes. Sorry, I misunderstood. I was looking at the injury in fact. But as far as redressability, yeah, you'd be looking at mitigation. I might be – I'm going to ask you a question even though you're yellow-eyed still. I might be a little more concerned about the nexus between your claim of injury and action on the part of Nationwide. I mean, there's no question that there's a nexus between your claim of injury and what the hackers did. But I'm a little more concerned about how that is an action on the part of Nationwide. Well, here, the action, as alleged, was that they failed to maintain appropriate safeguards to protect the information, personal, private information within their possession. And the complaint goes into – it states, in use of the word's terminology, that they failed to utilize sufficient administrative, technical, and physical safeguards to protect the information. Because, I mean, the information was entrusted to them. It was stolen from them. Plaintiffs are now at harm as a result of their failure to protect the information. The relationship with – So your view would be that there has to be a perfect system on Nationwide's part, or they're going to be – or someone's going to have Article 3 standing if there's a breach? I believe that the allegations are that there needs to be a perfect system, but they need to be reasonable and adequate – a reasonable and adequate system. And that's – for purposes of Article 3 standing at this stage, at the pleading stage, I believe those allegations are sufficient. And then you go to the merits. You'd have to show that they were negligent, that they didn't meet a reasonable standard. Yes, absolutely. There's no such thing as a perfect system. Thank you. May it please the Court, Your Honors, my name is Mike Herbender, and I represent the defendant, Appalooh Nationwide Mutual Insurance Company, in this case. And I am urging this Court to affirm both of the decisions in the trial court below. They were both correct. February 10, 2014 decision, granting our motion to dismiss, and the March 11, 2015 decision, denying the plaintiff's request to alter or amend for reconsideration of the 59E, the Court's decision, and for leave to file an amending complaint. These consolidated cases, as the Court recognizes, arises from a data breach of October 3, 2012. And as the plaintiffs allege, and as this Court has already alluded to, this was a criminal act. The plaintiffs allege the data was stolen, not furnished, not provided. It was stolen by third-party actors who are not before this Court. And that, based on that, and the decision in Clapper, the trial court correctly ruled that there was no Article III standing for the state law claims, and correctly also found no statutory standing for the Fair Credit Reporting Act claims. As this Court has clearly indicated today, and has acknowledged, the problem with the Clapper decision from the plaintiff's standpoint is that we are dealing with third-party actors. And that was the teaching of Clapper. The third-party actors were not before the Court, and the Court was looking to see how you allege standing when you don't know what those third-party actors are going to do. This is not like the typical case I see. Sometimes, on the objective side, I think about this beautiful courtroom we're in, and I think about if somebody has the construction crews down front, they have permits, and they have everyone wind up to demolish this courthouse, then we have certainly a pending injury, and I can come to this Court and seek redress and stop that. If somebody mentions, if somebody does something, and alludes to the fact that this courthouse ought to be destroyed, that's not certainly pending. I guess I'm not following. I mean, I understand what you're saying, but in Clapper, they were challenging legislation, and whether they were going to suffer harm was a series of ifs. No one had acted. No one had done anything. Here, if you accept their complaint, and that's what we have to do, the criminals got the data because your client failed to adequately protect it, and they already have the data. And so I find it very hard to take this and put it into the Clapper framework. I think what you have to be saying is that they have not suffered harm, that stealing the data, when criminals steal the data, there's no harm, and that they're not harmed until somebody uses it. Is that what you're saying? What I'm saying is there's no actual injury, and there's no certainly pending injury, and they did not allege certainly pending injury, and they have not argued that in front of this Court. It's been three years and five months since this data breach. They had opportunity after opportunity to come forward and make allegations and assert actual injury or certainly pending injury, and they didn't. The two complaints before this Court, Your Honor, were completely divorced from any sort of claim of actual injury. They talked about, and they've argued here today, a possible risk of future injury, and that's the tenuous nature that Clapper instructs on, a possible future injury. And that's all they pledge. If you go back and look at their original complaints. They sent them a letter that sort of told them to be on alert and to take measures, to monitor and maybe to take some further actions to sort of lock accounts or things. So if somebody has to do that, then they've suffered some sort of injury, haven't they? Sending a letter because you're a good company and my client is a good company. They were on top of this data breach within hours, and they remedied it and stopped it quickly, and they got the letters out within a matter of weeks. November 16th was the allegation in the complaint. Because my client has done nothing, it doesn't constitute actual injury. It constitutes a notice of a data breach. And the plaintiffs in their complaint alleged the letter received, but they alleged they did nothing further. They don't allege in this case that they did anything in response to that letter, other than file this lawsuit. But that's not actual injury, filing a lawsuit, and it's not certainly a pending injury. And the plaintiffs' counsel has admitted that to you today when the court was questioning him. They do not allege that. They allege right-of-road recitation of statutes and elements. And Juan Blinick will instruct us that elements masquerading as facts do not constitute facts. What they allege is that we are an insurance company and that we provide insurance quotes. And they submitted information to us for those insurance quotes. And that criminals hacked into our system and stole some of that information. They stop there. They stop there. They say that there may be some possible future harm to us, but they don't go the next step and say, here's the harm that has been occasioned to us. What we have learned is they must be within the zone of harm. There must be some injury, some statutory violation under the Fair Credit Reporting Act. But under the common law and under the common law claims they're making, one of the elements of negligence is to allege injury. And they allege no actual injury. So is the Second Circuit case different or wrong? It is both. If I could answer that, it is both. First, it used an objectively reasonable standard, not the standard that the Supreme Court has used. Objectively reasonable is not the standard. In fact, the court in Clambert had before it objectively reasonable, and it specifically rejected that as the standard. I believe it came up through the Second Circuit, and it said that is not the standard. Secondly, in Neiman Marcus, as we pointed out, there were 9,200 fraudulent credit card charges that were of record and alleged in the case. Both of the plaintiffs, one plaintiff had a fraudulent debit card charge. The other plaintiff had a fraudulent credit card charge. The court concluded in the Seventh Circuit that that was actual injury or certainly a pending injury. Actually, they used objectively reasonable. But they said there was element, there was an allegation of injury. Here we have none of that, partly because this isn't a credit card case. This is a case in which one thing happened, and I urge this court not to go down this path. A data breach occurs. That's not enough. That's just not enough. And if this court adopts that and makes that the basis for standing, the mere fact that data breach occurs, these courthouses would be flooded with cases by persons who have no standing, who have no injury and have no certainly a pending injury. I'm confused. Don't we have a loss of privacy that is an actual injury? Someone other than these individuals has their personally identifiable information. Isn't that itself the injury? Before you get to the question of whether the possible identity of that person is an injury. There was an evasion of privacy claim in this case originally. The court identified just exactly what Your Honor is identifying and said is there a loss of private information and determined that it was not like a defamation case where it's published to one person. It has to be published to the public at large. And the court dismissed their evasion of privacy claim on a 12B6 ground with prejudice, and that has not been appealed here. But that all goes to the evasion of privacy claim. Doesn't that same loss of privacy go to injury under a negligence claim or a bailment? I don't believe so, Your Honor, because I don't believe in that particular instance it supports negligence or bailment. Bailment, as we know, is the exchange of personal identifying information in these circumstances to another. So when I got before this court today and I said I'm Mike Hartinger, I gave you my name. I gave it as incidental to a transaction in oral argument today. I don't expect you to give it back to me at the end. And I can't find a single case that has held a data breach constitutes a bailment situation. I think the plaintiffs can't either. I looked into the briefs. I saw none. But that has to do with whether they can proceed on the claim, whether they can show the merits of the claim as opposed to standing that claim. Well, I think what it shows is there's not adequate standing under bailment because there's been no giving with an expectation of return. That's my position on the bailment claim. On the evasion of privacy issue that Your Honor has raised, I don't believe that a data breach that results in no injury or currently a pending injury meets standing merely because a criminal has obtained, through a hack, certain data. It is unclear whether that data can be manipulated, used, recalled, or ever assembled. Here we know it hasn't happened. There have only been two plaintiffs that have sued us, Mr. Gholary and Mr. Hancock. And so we are still waiting three years and five months later for somebody to step forward and claim. Well, let me answer the judge's question. Why isn't it an injury for somebody to have that personal information, that bundle of personal information? The bundle of personal information without more would be our position. It does not constitute injury. It doesn't constitute an actionable claim for evasion of privacy, and it doesn't constitute article 3 standing. I apologize if I appear to be stubborn on this, but I have to say, I don't believe the mere fact that someone has my name constitutes standing. I don't think the fact that someone at the License Bureau has my Social Security number constitutes standing. But you've given those people permission to have your name and your other information. Here, obviously these third parties don't have, or the nationwide customers, they don't have my permission to have my information. So haven't I lost privacy just because they have my information without my permission? I think that if we begin stretching this too far, and we say that a criminal stealing something has now taken private information and nationwide has therefore disclosed private information, I think we've gone too far with respect to that. Well, and nationwide, without a doubt, would have arguments on the merits. I'm not saying it's nationwide's fault, obviously. I'm just focusing on standing. So just for standing purposes, haven't I shown enough of an injury just for the plaintiffs to be able to get to the merits? Well, 17 cases we cited are brief and put no fives. They know the overwhelming authority in this country is that what you just postulated does not constitute adequate damage, injury, or certain pending injury for purposes of having a statutory claim, having standing. And so I believe that what we're headed towards and what I'm concerned about is the mere fact that data breach constitutes standing in and of itself. And the Riley case, this reading case that Your Honor referred to before from the Third Circuit, said not enough. Not enough that's in the hands of third-party actors. What would have to happen? Let's assume that it's negligent, okay? I mean, I know you resist that. But assume that there's been negligence in the failure to protect data. What—and that someone has hacked in, obviously with criminal intent. What has to happen for a plaintiff to have standing? The plaintiff must say more than just they were subject to a data breach. They must say that they suffered either injury in fact through actual injury or through certainly a pending injury. And here they've alleged none of that in the court below. That's not really that difficult of an assignment to allege it. But here they've incurred no cost, no moderate cost. They have no examples in the two original complaints. They have no allegation. That anything has happened except an increased risk of future injury. How is this situation different from the situation in our case and I don't know whether you've heard of it, on Sutton v. St. Jude? The Sutton case, Your Honor, involved an aortic implant. An aortic implant at St. Jude Hospital. And what happened there was the court recognized, this court recognized, that having a foreign body with a quantifiable risk of failure put into the human body constitutes adequate allegation of future injury to confer standing. But it was a quantifiable risk of failure, that aortic device, and the court also recognized we're dealing with human health and we're dealing with the fact that it has been embedded and planted in the human body. Those are the facts that people have... There have been courts that have looked at that case and said, how is this different? And all of the courts that have looked at it have said, those are the distinctions that make it not applicable to that in each case. So I see that my yellow light is on. I'll continue to answer questions, but I really would urge the court, I think the judge's decision on the motion for leave to amend demonstrated the futility of the Fair Credit Reporting Act claims in this case, but I would urge you to affirm both of the decisions below. When I asked you what's enough, I mean, you were focusing on the pleadings, that they didn't allege certain things. Are you saying that in a case like this you could plead it properly? I don't think Mr. Galleria and Mr. Hancock's completed properly because three years and five months have passed and we know that they do not have either actual injury or currently pending injury. I don't know if someone else who has that circumstance, such as in Neiman Marcus, I don't know if someone comes forward and alleges that, whether that would be adequate. I can only say it in the facts of this case before this court, it is not adequate. In Neiman Marcus, the court, some people had, some of the plaintiffs had fraudulent charges, but the court went on to say that everybody had standing. It was a class action, and because the court recognized that 9,200 fraudulent charges had occurred, that was adequate for the court to conclude that there was standing because there was a likelihood, an objectively reasonable likelihood under the Seventh Circuit standard, not a certainly pending standard, they concluded that was enough. That's correct, Your Honor. So I would even say in that circumstance, however, when there's credit card debt, and this isn't a credit card case before you, this nationwide case. There was not credit card debt alleged to have been stolen or stolen, and there's no credit card charges that have occurred. And so I would urge you to be very careful as we proceed down the path because all of the things the plaintiffs are citing typically come from credit card cases. When you go to pure data breach, when you go to pure data breach cases, you will find, and I urge you to look at them, that no court has accepted what they're trying to place before you. In each instance, every case they cite, and they say the current trend is for a possible risk of future harm. I looked at the cases. I urge you to look at the cases, and every one there was actual fraudulent charges, actual fraudulent tax returns, actual fraudulent acts conducted by someone else, some other third party, but by someone else. Here, and I admire plaintiffs' counsel for admitting to you today, that hasn't happened. That wasn't alleged, and it wasn't before the trial court. So even in instances in which there are those allegations, however, courts around the country have still concluded there's no adequate Article III standard. Thank you, counsel. Thank you, Your Honor. I just have a few points that I'd like to address on the bottle. The first is, I know the opposing counsel continued to state that there's been no harm. The amendment complaint did allege that Gallery had suffered identity theft, that an individual did attempt to open three credit cards in his name using the same information that was involved in the data breach, including his Social Security number. And that's really why Social Security numbers are so valuable, and so dangerous when stolen is because people can actually open accounts in your name. I'm sorry, when did this happen? When the credit cards were opened in his name? Yeah. I know it was shortly before. I can get that. No, I mean, that's what you sought to amend with, right? Yes. It was included in the amendment complaint, yes. But did that happen before or after the judgment? It happened before. It was included in the proposed amendment complaint, so it was before the judgment. It happened before the judgment. Now, on the statements that counsel made regarding the clapper standing for the proposition that the risk of theoretical harm or future harm or credible threat of harm isn't sufficient for standing, I think that the Susan B. Anthony Bliss case, the work of Dryas, makes it clear that that's not the case. In the Susan B. Anthony Bliss case, you're dealing with two organizations, actually, who said that, stated that looking for an injunction or declaring a, basically striking down an Ohio law that allowed people to challenge statements made regarding elected officials that were quote-unquote false. The court found that because of the statements that the organizations have made in the past and stated that they plan to make similar statements in the future, that that was enough, that there was basically a credible threat. They used the term maintaining or significant risk language, but there was a credible threat that that law would be used against them in the future. So to the extent that counsel represented that clapper increased the standing standard that the court's been using for decades, that's just not the case. To the extent that counsel attempted to use the Parade of Horribles scenario, Seventh Circuit in 2007, the Pisciotta case held that you had standing to a certain data bridge case. Courthouses in Seventh Circuit where I reside, I promise you, have been flooded with data bridge cases. The Ninth Circuit in Krotner, similar held in 2010, that standing could be used in these cases, was satisfied in these cases. I think that's all of my time, unless you have any further questions. I do not. Thank you, counsel. The case is dismissed. Thank you. Mr. Goldman, please.